IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | |
|---|---|
| MAURICE A. LAYTON, | ) |
| | ) Civil Action No. 2: 20-cv-0519 |
| Plaintiff, | ) |
| | ) United States Magistrate Judge |
| v. | ) Cynthia Reed Eddy |
| | ) |
| DR. DENISE SMYTH, WILLIAM NICHOLSON, STEPHANIE WOOD, and ROBERT D. GILMORE, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION RE: MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT DENISE SMYTH, M.D.[1]**

Pending before the Court is the Motion for Summary Judgment, with brief in support, filed by Defendant Denise Smyth, M.D. (ECF Nos. 94 and 95). Plaintiff filed a Memorandum of Law in opposition (ECF No. 104), to which Defendant Smyth filed a Reply Brief. (ECF No. 107). The issues are fully briefed and the factual record thoroughly developed. (ECF Nos. 96, 97, 105, and 106). After carefully considering the motion, the material in support and opposition to it, the memoranda of the parties, the relevant case law, and the record as a whole, the motion for summary judgment will granted.

**I.      Procedural and Factual Background**

Plaintiff, Maurice A. Layton, is a prisoner in the custody of the Pennsylvania Department of Corrections currently housed at the State Correctional Institution at Huntingdon ("SCI-

---

[1] This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343. The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of judgment. (ECF Nos. 23, 27, and 44).

1

Huntingdon"). The events giving rise to this lawsuit occurred while Layton was housed at SCI-Greene during the time period February 2018 to November 2019.[2] Layton initiated this case on April 14, 2020, by the filing of motion for leave to proceed in forma pauperis ("IFP Motion"). Attached to the IFP motion was a civil rights complaint in which Defendants Smyth, Nicholson, Wood, and Sharon "Doe" were named defendants. The Complaint was lodged pending disposition of the IFP motion. (ECF No. 1). On April 21, 2022, the IFP motion was granted (ECF No. 2) and the Complaint filed that day. (ECF No. 3). Prior to service, Layton filed an Amended Complaint on July 24, 2020. (ECF No. 18). In lieu of filing a responsive pleading, Defendants Gilmore, Nicholson, and Wood (collectively referred to as the "Commonwealth Defendants") filed a motion to dismiss (ECF No. 34). In response to the Commonwealth Defendants' motion to dismiss, and prior to Defendant Smyth filing a responsive pleading, Layton filed a verified Second Amended Complaint ("SAC") (ECF No. 42), which supersedes the Amended Complaint. The SAC remains Plaintiff's operative pleading. *See Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019) ("In general, an amended pleading supersedes the original pleading and renders the original pleading a nullity. Thus, the most recently filed amended complaint becomes the operative pleading.") (internal citations omitted).

Named as defendants in the SAC are Defendant Denise Smyth, M.D., a former physician at SCI-Greene, and the Commonwealth Defendants, three non-medical prison officials who were employed at SCI-Greene during the relevant time period: Robert Gilmore, the Superintendent of SCI-Greene; Mark Nicholson, the Corrections Health Care Administrator; and Stephanie Wood, the Healthcare Administrator. Layton brings his claims under 42 U.S.C. § 1983, contending that

---

[2] Layton was transferred to SCI Huntingdon on November 26, 2019. Smyth's Concise Stmt., at ¶ 95.

all Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.  He also contends that Dr. Smyth violated his "informed consent" and his right to refuse Tofranil, a psychiatric drug.

Defendants each filed motions to dismiss, to which Layton filed an omnibus response. (ECF Nos. 46, 48, and 52).  On July 16, 2021, the Court denied in part and granted in part the motions.  (ECF No. 59).  The Court found that Layton, through the SAC, had alleged enough facts to create plausible Eighth Amendment deliberate indifference claims against all the Defendants, but dismissed the Fourteenth Amendment claims to the extent that those claims were based on the same conduct that supported his claims under the Eighth Amendment.  Layton's state law claims of medical malpractice and professional negligence were also dismissed.

After the close of discovery, Defendant Smyth filed the instant motion for summary judgment, with brief and supporting documentation. (ECF Nos. 94, 95, 96, 97, and 98).  Layton filed a brief in opposition (ECF No. 104),[3] a counter statement of material facts (ECF No. 105), and his own exhibits, including his own Declaration, the Declaration of Zahir Boddy-Johnson, and the Declaration of Justin Robertson.  (ECF No. 106).  The factual allegations set forth in Layton's verified SAC (ECF No. 42), to the extent they are based upon his personal knowledge, will also be considered as evidence on summary judgment.  *Jackson v. Armel*, 2020 WL 2104748, at *5 (W.D. Pa. May 1, 2020) (citing *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985)

---

[3] In her Reply Brief, Defendant Smyth states that "Layton filed a late Response Brief." The response brief was ordered to be filed by June 10, 2022. (ECF No. 103). Layton's brief was received by the Court on June 14, 2022; the brief, however is dated June 1, 2022, and the envelope is postmarked June 10, 2022. (ECF. No. 104-2). Because Layton is a prisoner, he is entitled to the benefit of the prisoner mailbox rule. Under the "federal" prisoner mailbox rule, a document is deemed filed on the date it is given to prison officials for mailing. *Pabon v. Mahanoy*, 654 F. 3d 385, 391 n.8 (3d Cir. 2011) (citing *Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998)). Accordingly, the Court finds that the response brief was timely filed.

(treating verified complaint as an affidavit on summary judgment motion)). *See also Brooks v. Kyler*, 204 F. 3d 102, 108 n. 7 (3d Cir. 2000) (noting that an affidavit is "about the best that can be expected from a [pro se prisoner] at the summary judgment phase of the proceedings"); *Boomer v. Lewis*, 2009 WL 2900778, at *2 n.4 (M.D. Pa. Sept. 9, 2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge.").

The motion for summary judgment filed by Defendant Smyth is ripe for disposition.[4]

## II.     **Standard of Review**

The standard for assessing a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is well-settled.  A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 250.

On a motion for summary judgment, the facts and the inferences to be drawn therefrom should be viewed in the light most favorable to the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

---

[4] This Memorandum Opinion addresses only the motion for summary judgment filed by Defendant Smyth.  The Court contemporaneously has filed a separate Memorandum Opinion addressing the motion for summary judgment filed by the Commonwealth Defendants.

*Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Hudson v. Proctor & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S at 247-48. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with respect to that issue. *See id*. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'." *Matsushita*, 475 U.S. at 587; *Huston,* 568 F.3d at 104.

This standard is somewhat relaxed with respect to pro se litigants. Where a party is representing himself pro se, the complaint is to be construed liberally. A pro se plaintiff may not, however, rely solely on his complaint to defeat a summary judgment motion. *See, e.g., Anderson*, 477 U.S. at 256 ("Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."). Allegations made without any evidentiary support may be disregarded. *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000); *see also Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment.").

With these standards in mind, the Court will now turn to the motion for summary judgment.

### III. Discussion[5]

Defendant Smyth argues that she is entitled to summary judgment because Layton failed to exhaust his administrative remedies and, in the alternative, Layton has not shown that Defendant Smyth was deliberately indifferent to his serious medical needs. Rather, according to Defendant Smyth, the undisputed summary judgment record reflects that Layton received extensive and adequate medical care and treatment. Layton counters that summary judgment should not be granted because genuine issues of material facts are in dispute. Layton does not dispute that he received medical care, rather he contends that the care he received was inadequate under the circumstances. According to Layton, Dr. Smyth should not have prescribed Asacol for an extended period of time, especially during those times when his ulcerative colitis was in remission. He also contends that Dr. Smyth prescribed Toranil to intentionally cause him mental and physical pain and that he did not give his informed consent for that medication.

#### A. Failure to Exhaust

The threshold question that must be determined in any prisoner civil rights case is whether the prisoner has exhausted his administrative remedies in accordance with the mandate of the Prison Litigation Reform Act ("PLRA"). *See Downey v. Pennsylvania Dep't of Corrections,* 968 F.3d 299, 304 (3d Cir. 2020) (stating that "[e]xhaustion is a threshold requirement that district courts must consider."). *See also Woodford v. Ngo*, 548 U.S. 81, 88 (2006); *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018). The exhaustion requirement is a "bright-line rule" and "it is beyond the power of this court – or any other- to excuse

---

[5] There are times during the relevant time period when Dr. Smyth was known as Denise Daniels, M.D. For ease of identifying the relevant actor in the referenced medical records, the Court will refer in all instances to Dr. Daniels as Dr. Smyth.

compliance with the exhaustion requirement, whether on the ground of futility, inadequacy, or any other basis." *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000). The DOC Grievance Policy, Section VI.A.1.7, provides that the following information must be included in the initial grievance:

> The inmate will include a statement of the facts relevant to the claim. . . . <u>The inmate will identify any person(s) who may have information that could be helpful in resolving the grievance.</u> . . .

DC-ADM 804, Inmate Grievance System Policy, Part VI.A.1.7 (ECF No. 97-5 at p. 6) (emphasis added).

Layton's Grievance History Report reflects that he filed six grievances relating to the inadequate medical care and treatment claims in this lawsuit. *See* Grievance Nos. 719656, 727197, 739791, 784471, 790614, and 791663. (ECF Nos. 97-4, 97-5, 97-7, and 106). Dr. Smyth argues that none of these grievances name Dr. Smyth and there is nothing in the grievances that would infer that Dr. Smyth was the subject of the grievances. Defendant Smyth is correct that to the extent Dr. Smyth's identity was a "fact[] relevant to the claim," it was mandatory for Layton to identify her in his grievances. *Spruill v. Gillis*, 372 F.3d 218, 234–35 (3d Cir. 2004). A close review of the six grievances at issue reveals the following.

In Grievance No. 719656, Layton reports that he "overdosed" on Asacol when he was given a high dose of Asacol by a "male nurse." Layton did not name Dr. Smyth in this grievance and has offered no explanation for his failure to do so. Any grievance against Dr. Smyth is now time-barred. *See* DC-ADM 804, Part VI.A.8 ("The inmate must submit a grievance for initial review to the Facility Grievance Coordinator within 15 working days after the event upon which the claim is based."). (Id. at p. 7). Layton has procedurally defaulted this claim against Dr.

Smyth by failing to identify her. Because Layton has not exhausted his administrative remedies with regard to Grievance No. 719656, this claim is barred for failure to fully exhaust administrative remedies.[6]

In Grievance No. 721197, dated 3/21/2018, Layton reports that the "Medical Department" has not provided him with any relief for his ulcerative colitis symptoms. No individuals are identified in the grievance. Layton did not appeal to final review the denial of this Grievance. Therefore, it is of no moment that the grievance did not name Dr. Smyth as this claim is barred for failure to fully exhaust administrative remedies.

Grievance Nos. 739791, dated 5/25/2018, and 784471, dated 1/30/2019, both pertain to Layton's prescription for Asacol. In both, Layton states he is receiving inadequate medical treatment as his prescription for Asacol should be discontinued because, he contends, he no longer has ulcerative colitis. Dr. Smyth is not named in either of these grievances. While both these grievances are procedurally barred, the prison's grievance process excused the procedural default of Grievance No. 739791: The grievance officer's "Initial Review Response" identified Dr. Smyth by name as the medical director and stated that Layton was under her care. *See* Initial Review Response, ECF No. 97-4 at p. 19. "[T]he prison can excuse an inmate's failure [to identify individuals in the grievance], by identifying the unidentified persons and acknowledging that they were fairly within the compass of the prisoner's grievance." *Spruill v. Gillis*, 372 F.3d 218, 234-35 (3d Cir. 2004). The Court concludes that the prison grievance officer's recognition that Dr. Smyth was involved in Layton's medical care excused any procedural defect in Layton's

---

[6] Even assuming that this claim was exhausted, the claim fails. As discussed in the Discussion section of this Memorandum Opinion, there is no medical evidence in the summary judgment record that reflects that Layton ever overdosed.

8

initial grievance. Thus, Layton's claim that Dr. Smyth provided inadequate medical care by continuing to prescribe Asacol will be reviewed on its merits.

Layton's final two Grievances, No. 790614, dated 3/7/2019, and No. 791663, dated 3/14/2019, both involve Layton's complaints that he was given Tofranil inappropriately and without his consent. Dr. Smyth is not named in either of these grievances. This is a closer call. However, these two grievances are not about specific instances of inadequate care, but rather are about a "larger-scale denial of adequate medical care, in which prison officials clearly knew" that Dr. Smyth, as the medical director, was implicated. *Spruill v. Gillis*, 372 F.3d at 234. Additionally, the medical records reflect that Layton was prescribed Tofranil by Dr. Jayakumar, after consultation with Dr. Smyth. The Court finds that these two grievances were sufficient to put the prison officials on notice that Dr. Smyth was one of the subjects, if not the subject, of the grievances. Thus, Layton's claim that he was inappropriately prescribed Tofranil and that his informed consent was not given will be reviewed on its merits.

### B. Eighth Amendment – Deliberate Indifference to Serious Medical Needs[7]

Section 1983 of the Civil Rights Act provides:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. Thus, to state a claim for relief under this provision, a plaintiff must demonstrate that (1) the alleged misconduct was committed by a person acting under color of

---

[7] The factual background is taken from the verified Amended Complaint, Dr. Smyth's concise statement of material facts, Layton's statement of facts in dispute, and the extensive exhibits in the summary judgment record.

state law; and (2) that such conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). The parties do not dispute that Dr. Smyth was acting under the color of state law.

The parties also do not dispute that Layton's claims of deliberate indifference arise under the Eighth Amendment to the U.S. Constitution.[8]  In order to sustain this constitutional claim under 42 U.S.C. § 1983, a prisoner must make "(1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious." *Pearson v. Prison Health Service*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) and citing *Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002)).

Dr. Smyth does not contest that Layton's medical needs were serious and the Court will assume, for purposes of deciding the summary judgment motion only, that Layton's medical needs were serious. See *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003) ("[T]his court has defined a medical need as serious if it has been diagnosed by a physician as requiring treatment"). Thus, only one issue is before the Court: has Layton presented sufficient evidence from which a reasonable jury could find that Dr. Smyth was deliberately indifferent to Layton's serious medical needs.

" 'Deliberate indifference' is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm." *Andrews v. Camden Cnty.*, 95

---

[8] While Layton brings this case under 42 U.S.C. § 1983, the substantive right at issue nonetheless derives from the Eighth Amendment. As the Supreme Court has stated, Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution . . . that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

F.Supp.2d 217, 228 (D.N.J. 2000) (citing *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994)). And an inadequacy of care claim, such as Layton's, involves both an objective and subjective inquiry; unlike a delay or denial of medical treatment claim which involves only a subjective inquiry. *Pearson,* 850 F.3d at 537.

It is well-settled that when medical care has been provided "mere disagreement as to the proper medical treatment" does not "support a claim of an [E]ighth [A]mendment violation." *Monmouth Cty. Corr. Inst. v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). "Federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Pearson*, 850 F.3d at 537 (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). Furthermore, courts "disallow any attempt to second-guess the proprietary or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alterations in original). Rather, it is presumed that the treatment of a prisoner is proper absent evidence that it violates professional standards of care. *Pearson*, 850 F.3d at 535 (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.")).

The undisputed medical evidence of record reflects that Layton has multiple medical conditions for which he receives medical treatment, including a history of seizures, hypertension, pulmonary issues, and asthma. Additionally, in 2008, after having a colonoscopy and

gastroscopy, Layton was diagnosed with mild to moderate ulcerative colitis[9] and prescribed Asacol. *See* ECF 106-2.

In February 2016, Layton was transferred to SCI-Greene. (SAC, ¶ 11). Layton's medical records reveal that he received extensive medical care by various medical providers, including Dr. Smyth, while he was housed at SCI-Greene.[10] Layton was seen by the SCI-Greene Medical Department for complaints of abdominal pain and diarrhea approximately twenty times during the time period February 2018 – November 2019. A brief summary of his medical history follows.

Tests and Procedures Ordered

While housed at SCI-Greene, Layton had numerous tests and procedures in order to evaluate and treat his abdominal pain and diarrhea and to rule out other possible causes, such as irritable bowel syndrome. For example, Layton had:

* laboratory studies on March 3, 2018; May 9, 2018; November 13, 2018; December 3, 2018; January 22, 2019, May 22, 2019; and November 14, 2019;

* a colonoscopy on April 17, 2018;[11]

---

[9] "Ulcerative colitis is a chronic inflammatory bowel disease in which there is inflammation and sometimes ulcers in the colon. It can cause abdominal pain, diarrhea and blood in the stools." Verification of Denise Smyth, M.D., at ¶ 6 (ECF No. 97-6).

[10] According to the SAC, Dr. Smyth was the medical director at SCI-Greene. SAC at ¶4; *see also* Initial Review Response to Grievance No. 727197, which refers to Dr. Smyth as the Medical Director. (ECF No. 97-4 at p. 12). The medical evidence reveals that Dr. Smyth saw Layton only on three occasions: February 1, 2018; February 8, 2018; and July 10, 2018. The medical records reflect, however, that members of the Medical Staff often consulted with Dr. Smyth concerning Layton's ongoing medical treatment and that Dr. Smyth reviewed all consultation records and reports regarding Layton's medical care and treatment.

[11] During the colonoscopy on April 17, 2018, Layton had multiple polyps removed. No active inflammation was noted and there was no evidence of cancer within the polyps. The gastroenterologist did not recommend stopping Layton's medications.

* an x-ray and ultrasound of his abdomen on November 29, 2018;

* a flexible sigmoidoscopy on January 18, 2019;

* a CT scan of his abdomen and pelvis on January 28, 2019; and

* an esophagogastrodenoscopy (EGD) with biopsy on January 28, 2019.

Medical Treatment for Abdominal Pain and Diarrhea

Beginning in June of 2017, Layton began filing sick call complaints stating that he was not receiving appropriate medical treatment for, *inter alia*, abdominal pain and cramps, loss of weight, loss of appetite, and diarrhea. On February 1, 2018, Layton reported to Dr. Smyth that his Asacol prescription was no longer controlling his symptoms. Dr. Smyth examined Layton and increased his Asacol prescription from 800 mg twice daily to 1600 mg three times daily for six weeks.[12] The following week, Layton reported having some intermittent dizziness and headaches, possibly due to the dose increase.[13] Dr. Smyth then discontinued the increased Asacol dosage and Layton was placed back on 800 mg twice daily.

On May 24, 2018, Layton was seen by Dr. Sunita Jayakumar and reported having diarrhea despite being on Asacol. Dr. Jayakumar believed the diarrhea may have been secondary to irritable bowel syndrome and ordered Prednisone and Imipramine (Tofranil). The following

---

[12] In her Verification, Dr. Smyth states that "[w]hen there is a flare up [of ulcerative colitis] and increased symptoms the standard of care is to increase the medication." Verification, at ¶ 8 (ECF No. 97-6).

[13] Layton alleges that Dr. Smyth "overdosed" Layton with this increased prescription for Asacol, however, no supporting evidence of an "overdose" of any medication, including Asacol, appears in the medical records. The medical records reflect that Layton reported experiencing intermittent dizziness and headaches, which Dr. Smyth determined was possibly due to the dose increase. The increased dosage was discontinued and the prescription for the original dose was reinstated. Layton's allegations of an "overdose" are unsupported by the summary judgment record.

month, Layton was seen by Dr. Smyth and he reported doing much better after starting the steroids and Tofranil.  However, on October 18, 2018, Layton reported cramping in his right upper quadrant near his liver.  He insisted that he had never had a colonoscopy in which the results showed ulcerative colitis, and he questioned why he was being prescribed Asacol.  He was informed that he could stop taking the Asacol, but that would be his choice if he decided to discontinue the prescription at that time.

From October 17, 2018, through January 9, 2019, Layton submitted numerous sick call complaints stating he was experiencing constant abdominal pain and cramps.  On January 28, 2019, Layton had a CT scan of his abdomen and pelvis and an esophagogastrodenoscopy (EGD) with biopsy.  The results found no evidence of inflammatory bowel disease.  As a result of the negative results, the prescription for Asacol was discontinued on February 15, 2019.  *See* 2/15/2019 Progress Notes of CRNP Sharon Colaizzi (stating that "Discussed case with MD, OK to D/C [Asacol] as directed GI MD with final pathology results negative for IBS or UC.") (ECF No. 97-2 at p. 34).  *See also* SAC, at ¶ 50 (Dr. Smyth informed Layton that "[t]he Asacol was discontinued as per GI recommendations if biopsies were negative, which they were.  You need repeat colonoscopy in 1 year.")

On March 6, 2019, Layton had a consult with Manhal Tannous, M.D., a gastroenterologist.  In his consult report to Dr. Smyth, Dr. Tannous stated:

> Patient is a 33 year old inmate with a history of ulcerative colitis diagnosed 2009. Colonoscopy findings and sigmoidoscopy in the last year did not show any active disease.  Patient wishes to stop medication.  We discussed the risk of discontinuing medication including risk of reactivation.  As repeating the flexible sigmoidoscopy and the biopsy was completely negative. (sic)  I do believe it reasonable to attempt to stop the medication for ulcerative colitis which is Asacol. This already was stopped by the medical doctor at the present. Patient currently

doing well without any symptoms of recurrence of the disease. We'll plan for repeat colonoscopy in one year.

(ECF No. 97-1, at p. 69). Layton was transferred to SCI-Huntingdon on November 29, 2019.[14]

After a careful review of the medical evidence of record, the Court finds that Layton cannot point to any evidence in the summary judgment record from which a reasonable jury could determine that Dr. Smyth was deliberately indifferent to his serious medical needs. Layton received extensive medical treatment in an effort to treat his abdominal pain and recurrent diarrhea. While Layton contends that the prescription for Asacol should have been discontinued during those periods when his ulcerative colitis seemed to be in remission, the undisputed summary judgment medical evidence of record indicates that Dr. Smyth, along with the other medical providers at SCI-Greene, determined that continuing Layton on Asacol was an appropriate treatment to help reduce the inflammation and to maintain remission. Furthermore, Layton has not produced any evidence to suggest that he suffered any harm from remaining on Asacol for an extended period of time.

In sum, the Court finds that there are no facts in this summary judgment record from which a reasonable jury could find that Defendant Smyth was deliberately indifferent to Layton's serious medical needs.

---

[14]  Also in the summary judgment record are medical records reflecting Layton's medical treatment after he transferred out of SCI-Greene. As there are no claims in this lawsuit regarding he adequacy of the medical care Layton is receiving since his transfer, the Court has not taken into consideration these medical records. However, the Court notes in June of 2020, Layton reported abdominal discomfort. The results of a colonoscopy in November 2020 showed chronic ulcerative pancolitis, with moderate to heavy inflammatory disease. Layton was instructed to restart Asacol, but he told the physician that he had an allergic reaction to Asacol. He was given Remicade infusions instead, a medication that is administered by IV to treat severe ulcerative colitis, crohns disease, and rheumatoid arthritis.

### C.       Fourteenth Amendment – Lack of Informed Consent

To the extent that Layton has brought a Fourteenth Amendment lack of consent claim, the Court finds that Defendant Smyth is entitled to summary judgment on the claim.

"[C]onvicted prisoners . . . retain a limited right to refuse treatment and a related right to be informed of the proposed treatment and viable alternative." *White v. Napoleon*, 897 F.2d 102, 113 (3d Cir. 1990). To establish a violation of a prisoner's right to informed consent, the prisoner must show that " '(1) government officials failed to provide him with such information; (2) this failure caused him to undergo medical treatment that he would have refused had he been so informed; and (3) the officials' failure was undertaken with deliberate indifference to the prisoner's right to refuse medical treatment.' " *Sanders v. Ocean County Board of Freeholders*, 2021 WL 637828, *3 (D.N.J. 2021) (internal citations omitted).

Here, the summary judgment record reflects that during Layton's appointment with Dr. Sunita Jayakumar on May 24, 2018, he reported experiencing diarrhea despite being on Asacol. Dr. Jayakumar believed the diarrhea may be secondary to irritable bowel syndrome and, after consulting with Dr. Smyth, prescribed Prednisone and Tofranil. (ECF No. 94-2 at p. 79). Layton argues that Tofranil is a antidepressant and that Dr. Smyth prescribed this medication "to maliciously and sadistically [] cause Plaintiff mental and physical harm." SAC, ¶ 63.

In her undisputed Verification, Dr. Smyth explains that Prednisone and Tofranil,

> are the medications of choice and were medically proper and needed. Contrary to Layton's statement Imipramine [Tofranil] is the proper medication to help with his symptoms and to help reduce his diarrhea. It is not an experimental medication. Dr. Sunita Jayakumar informed me that she discussed the administration of Imipramine [Tofranil] with Layton.

Verification of Denise Smyth, at ¶ 17 (ECF No. 97-6).[15]

---

[15]      Tofranil "is an antidepressant but it is used for gastroenterology problems. This is a

The record is void of any evidence reflecting that Tofranil was prescribed without Layton's consent, that Layton was forced to take this medication against his will, that Tofranil was prescribed with deliberate indifference to Layton's right to refuse medical treatment, or that Dr. Smyth prescribed Tofranil "maliciously and sadistically" to cause Layton mental and physical harm.  Moreover, the record is void of any evidence that Layton suffered any mental or physical harm as a result of being prescribed Tofranil.  Rather, the medical evidence of record reflects that in June 2018, Layton reported to Dr. Smyth that he was doing much better after starting the treatment with steroids and Tofranil.  Absent any evidence in the record from which a reasonable jury could find that Layton was prescribed Tofranil without his informed consent or that Defendant Smyth prescribed Tofranil "maliciously and sadistically" to cause Layton mental and physical harm, summary judgment will be granted to Dr. Smyth on this claim.

### III. Conclusion

For the foregoing reasons, the Motion for Summary Judgment filed by Defendant Denise Smyth, M.D., will be granted and judgment entered in her favor.  An appropriate Order follows.

Dated:  December 21, 2022

                                                  s/Cynthia Reed Eddy
                                                  Cynthia Reed Eddy
                                                  United States Magistrate Judge

---

common usage of the medication.  See https://www.mayoclinic.org/diseases-conditions/irritable-bowel-syndrome/diagnosis-treatment/drc-20360064."  D's Br. at p. 7, n. 1.

cc: **MAURICE A. LAYTON**
GK2255
SCI HUNTINGDON
P. O. BOX 999
1120 PIKE ST
HUNTINGDON, PA 16652
(via U.S. First Class Mail)

All Counsel of Record
(via ECF electronic notification)